```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  9/29/2014___
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
MARIA I. ROMAN,                            :
                              Plaintiff,   :
                                           :
           -against-                       :        12-CV-276 (VEC)
                                           :
SPRINT NEXTEL CORP.,                       :        OPINION & ORDER
NEXTEL OF NEW YORK, INC.,                  :
HTC CORP.,                                 :
HTC AMERICA HOLDING, INC.,                 :
HTC AMERICA INNOVATION, INC.,              :
SPRINT SPECTRUM L.P., and                  :
SPRINT SOLUTIONS, INC.,                    :
                            Defendants.    :
-----------------------------------------------------------:
SPRINT SPECTRUM L.P.,                      :
SPRINT SOLUTIONS, INC.,                    :
NEXTEL OF NEW YORK, INC., and              :
SPRINT NEXTEL CORP.,                       :
                            Cross-         :
                            Claimants,     :
                                           :
           -against-                       :
                                           :
HTC AMERICA HOLDING, INC.,                 :
HTC AMERICA INNOVATION, INC.,              :
HTC AMERICA, INC., and                     :
HTC CORP.,                                 :
                            Cross-         :
                            Defendants.    :
-----------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

        Plaintiff Maria Roman alleges that she sustained a burn on her left breast, which

developed into complex regional pain syndrome ("CRPS"), during an overnight bus trip from

North Carolina to New York City between October 2 and 3, 2010, from a cellular phone that was

manufactured by Defendants HTC Corporation and HTC America Holding, Inc. ("HTC") and

sold by Defendants Sprint Spectrum, L.P., Sprint Solutions, Inc., and Sprint/United Management

Company ("Sprint").  Sprint 56.1 ¶¶ 4-6.  Plaintiff filed this complaint in the Supreme Court of

the State of New York, New York County, on October 21, 2011, and HTC removed the action to

this Court on January 13, 2012.  Dkt. 1.  After the close of discovery, all Defendants moved for

summary judgment.  Dkt. 39; Dkt. 48.  All Defendants also moved to preclude the testimony of

Plaintiff's engineering expert, Roger L. Boyell, *id.*, and HTC moved to preclude the testimony of

Plaintiff's medical expert, Dr. Kiril Kiprovski, Dkt. 39.[1]  Plaintiff initially brought claims for

failure to warn, negligence, and breach of implied warranty.  Amended Compl., Dkt. 15.  She

now withdraws the claims for negligence and breach of implied warranty, leaving failure to warn

as the sole remaining cause of action.  Pl. Mem. Law Opp. at 2.

For the reasons set forth below, Defendants' motions for summary judgment are

DENIED.  Defendants' motions *in limine* to preclude the testimony of Mr. Boyell and Dr.

Kiprovski are GRANTED in part and DENIED in part.

## I.      BACKGROUND

On a motion for summary judgment, the Court construes the evidence in the light most

favorable to the nonmoving party.  *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d

Cir. 2008).  The following facts are drawn from the pleadings, Plaintiff's deposition, affidavits,

and exhibits submitted by the parties.

Plaintiff purchased an HTC EVO 4g cellular phone (the "cell phone") in June 2010.

HTC 56.1 ¶ 3.  The HTC User Guide ("User Guide") and the HTC Basics Guide ("Basics

Guide") include warnings related to the proper use of the product.  HTC 56.1 ¶ 4; *see* HTC Ex.

T; HTC Ex. R.  The cell phone, like all cell phones, is a low power radio transmitter and

---

[1]      On April 7, 2014, Plaintiff moved to preclude the testimony of Sprint's experts, Dr. Jane Welch (warnings expert) and Mark McNeely (engineering expert), and HTC's experts, Dr. Frank E. Gomer (warnings expert) and Eric Lalli (engineering expert).  Dkt. 72.  Those motions remain *sub judice*.

receiver.  Roman 56.1 ¶ 32.  It operates wirelessly by communicating with the Sprint network

through a transmitter chip that sends and receives radio frequency ("RF") signals to "base

stations," or network towers with antennas.  Roman 56.1 ¶¶ 39-41; HTC Response to Pl. 56.1 ¶¶

39-41.  When the cell phone is turned on, it sends and receives RF signals at varying intervals.

Roman 56.1 ¶ 33; HTC Response to Pl. 56.1 ¶ 33.

On October 2, 2010, Plaintiff boarded an overnight bus from Raleigh, North Carolina to

New York City.  HTC 56.1 ¶¶ 10-11, 26.  Before boarding, she charged her cell phone to 100% .

HTC 56.1 ¶ 12.  She made one brief phone call when she boarded the bus, then turned off the

screen, put the cell phone face down against her skin on the left side of her chest, and fell asleep

for the duration of the nine-hour bus ride.  HTC 56.1 ¶¶ 18-20.  She did not power down the

phone, nor did she take any steps to turn off WiFi, roaming, or any idle applications.  Roman

Aff. ¶ 5.  After exiting the bus in New York City on October 3, 2010, she removed the phone

from under her camisole.  Pl. Reply to HTC 56.1 ¶ 27.  The surface of the phone had stuck to her

skin, and she felt pain when she pulled it loose.  Pl. Mem. Law Opp. at 3.  The battery depleted

from almost 100% to approximately 25% during the bus ride.  *Id.*

Shortly after arriving in New York, Plaintiff showered and noticed a burning, tingling

sensation where the cell phone had been.  *Id.*  Over the course of the day, she began to feel like

she had a "rash" in the area, and later that evening she noticed some skin was missing and

blistered.  *Id.*  On October 6, 2010, Plaintiff saw her family doctor, who prescribed an ointment

commonly used to treat burns.  Roman Dep. at 128 (HTC Ex. X).  It took more than 10 days for

the skin to heal, and the burn left a scar.  *Id.* at 132.  Although the surface pain subsided, pain in

the tissue beneath the skin persisted.  *Id.* at 134-35.  On December 1, 2010, Plaintiff sought

treatment for the lingering pain from a breast specialist who had treated her in 2008 to remove a

3

cyst from the same breast.  *Id.* at 136-138.  After various other treatments, on June 27, 2012, she sought treatment from Dr. Kiril Kiprovski.  *Id.* at 157-158.  After his initial consult, Dr. Kiprovski concluded that the burn from the cell phone damaged the intraepidermal and dermal nerves beneath the skin, which caused her to suffer from CRPS.  Kiprovski Report, Cerussi Decl. Exh. DD, at 4.  Plaintiff claims she still suffers from pain in the area where she sustained the burn.

Plaintiff read the Basics Guide in its entirety when she purchased the phone in June 2010. HTC 56.1 ¶ 5; Roman Dep. at 32 (HTC Exh. X).  According to Plaintiff, neither the Basics Guide nor the User Guide contained warnings that would have alerted a user to the risk of sustaining a burn from storing the cell phone, powered on, next to her body for an extended period of time while traveling.

## II.    DISCUSSION

Plaintiff alleges that Defendants negligently failed to warn that the HTC EVO 4g phone continually emits thermal energy and RF radiation and that the risk of injury from exposure to these emissions varies based on factors such as the operating state of the phone, the active applications of the phone, whether the carrier of the phone is traveling or stationary, the proximity of the phone to the body, and the area of the body exposed to the emissions.  Amended Compl. ¶¶ 32-34, 41-42.

Defendants moved for summary judgment on the grounds that Plaintiff lacks sufficient evidence to create a genuine issue of fact as to causation; that the Basics Guide warned against Plaintiff's use; and that Plaintiff lacks sufficient expert evidence to create a genuine issue that the warnings provided were inadequate.  Sprint Reply Mem. Law at 2, 9; HTC Mem. Law at 19; HTC Reply Mem. Law at 5-9.  Plaintiff claims that the circumstantial evidence creates a genuine

issue of fact whether the cell phone was a substantial cause of her injury – even without expert testimony – and whether the warnings in the Basics Guide and User Guide adequately alerted a user to this risk.  Pl. Mem. Law Opp. at 11, 15-16.

### a.  Expert Evidence

The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the expert meets the requirements of Federal Rule of Evidence 702.  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 tracks *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993), and its progeny.  *See* Fed. R. Evid. 702 advisory committee's note.  The ultimate object of the court's gate-keeping role under Rule 702 is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  To this end, Rule 703 allows an expert to proffer an opinion based on facts "that the expert has been made aware of or personally observed," or, alternatively, on facts or data that "experts in the particular field would reasonably rely on" in forming the opinion.  Fed. R. Evid. 703.  But *Daubert* rejected a "rigid" standard that would require general acceptance of the expert's opinion in the scientific community because such a standard would be "inconsistent with the liberal thrust of the Federal Rules."  *McCullock*

*v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995) (citing *Daubert*, 509 U.S. at 588).  Instead, "[t]he flexible *Daubert* inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

A court's "inquiry into whether an expert meets Rule 702's requirements includes a review of (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based upon reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact."  *In re Puda Coal Sec. Inc. Litig.*, --- F. Supp. 2d ---, No. 11-CV-2598 (KBF), 2014 WL 2915880 at *15 (S.D.N.Y. June 26, 2014).  Reliability requires a "sufficiently rigorous analytical connection" between the expert's conclusions and the underlying methodology.  *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005).  The Supreme Court has cautioned that the district court's focus "must be solely on principles and methodology, not on the conclusions they generate."  *Daubert*, 509 U.S. at 595.  The Court acknowledges, however, that "conclusions and methodology are not entirely distinct from one another."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  If a court concludes that "there is simply too great an analytical gap between the data and the opinion proffered," it should exclude expert opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert."  *Id.*

To warrant admissibility, "it is critical that an expert's analysis be reliable at every step."  *Amorgianos*, 303 F.3d at 267.  "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies

the facts and methods to the case at hand." *Id.* But, in accordance with the "liberal admissibility standards of the federal rules," only flaws in reasoning or methodology "large enough that the expert lacks good grounds for his or her conclusions" warrant exclusion; otherwise, the court should admit the evidence and "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony" through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Id.* (citations omitted).

The final requirement for admissibility of expert evidence under Rule 702 is that "the expert's testimony (as to a particular matter) will 'assist the trier of fact.'" *Nimely*, 414 F.3d at 397.

> The requirement that expert testimony "assist the trier of fact" goes primarily to relevance. *Daubert*, 509 U.S. at 591, 113 S. Ct. 2786. Relevance can be expressed as a question of "fit" – "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). In addition, expert testimony is not helpful if it simply addresses "lay matters which the jury is capable of understanding and deciding without the expert's help." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999). Finally, the testimony is not helpful if it "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).

*In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009).

### 1. *Engineering Expert Roger L. Boyell*

Defendants object to the admissibility of Plaintiff's electrical engineering expert, Roger L. Boyell, on three grounds: first, they dispute Boyell's qualification as an expert to provide testimony on cell phone operation generally; second, they challenge the reliability of Boyell's testing of the phone's propensity to cause thermal burns; and, finally, they claim Plaintiff's disclosure did not meet the requirements of Rule 26(a)(2)(B) as to his opinions regarding RF

radiation, and therefore seek to preclude those opinions under Rule 37.  Sprint Mem. Law at 8-12; HTC Mem. Law at 6-7, 11-17.[2]

Turning to the first issue, Boyell's qualification as an expert: "[t]he court should admit specialized expert testimony if the witness is 'qualified as an expert by knowledge, skill, experience, training or education.'"  *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998) (quoting Rule 702).  "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).  If the witness has superior knowledge on the subject matter of the proffered testimony, and that knowledge would assist a lay juror in understanding a fact or issue in trial, then he may be qualified to provide expert testimony on that issue.  *See id.*

Mr. Boyell is a licensed Professional Engineer with 55 years of electrical engineering experience working with design, construction, testing, and evaluation of electrical devices and electronic systems, including radio and radar systems and cellular telephone systems.  Boyell C.V. at 1, 3, 6-8, Cerussi Decl. Exh. CC (Dkt. 44-6); Boyell Decl. ¶ 2 (Dkt. 64).  For the last 15 years he has been employed primarily as an expert witness on electrical engineering matters.  In that capacity, he has provided technical assistance on several disputes related to RF radiation, cell phones and their wireless networks, and heat transfers of electrical devices.  *See* Boyell C.V. at 9-19; Boyell Decl. ¶¶ 7-9.  He has a Bachelor of Electrical Engineering from the University of Florida and a Master of Science in Applied Science from Adelphi University.  Boyell C.V. at 3. He is a senior member of the Institute of Electrical and Electronics Engineers, a member of the

---

[2]      Defendants also argue that Boyell is not qualified to opine on cell phone design and manufacture or on warnings.  Sprint Mem. Law at 4-8; HTC Mem. Law at 6-10.  Plaintiff, however, has not proffered Boyell's testimony on those issues.  Pl. Mem. Law Opp. at 18-19.

National Society of Professional Engineers, and a fellow of the National Academy of Forensic Engineers.  *Id.*

Boyell's background and experience provide him with superior knowledge, education, and experience with cell phone operation and the mechanics of radio transmitting devices, and he is therefore qualified to testify on the technical aspects of how a cellular phone operates.  It is not a stretch to assume that lay jurors own cellular phones and understand how to use them but not necessarily how they work.  Boyell's testimony on how the cell phone was operating on Plaintiff's bus ride from North Carolina to New York would be relevant to assist the trier of fact to understand an issue that Plaintiff must establish in order to prevail: whether a normally operating (that is, a non-defective) cell phone could have caused Plaintiff's injury under the conditions that she used it.  Boyell's qualifications and the relevance of the subject matter of his opinion testimony satisfy these initial Rule 702 requirements.

Boyell's engineering analysis, on the other hand, is a different story.  After describing the facts of Plaintiff's alleged injury (the placement of the cell phone, the duration and distance of the bus ride, and the depletion of the battery), Boyell's written report served with Plaintiff's Rule 26 disclosure stated, "You [Plaintiff's counsel] asked me for an engineering analysis of the instrument's potential for thermal burns (from the direct application of heat, as opposed to radiation burns), and you provided me with the instrument at issue."  Cerussi Decl. Exh. CC ("Boyell Report") at 1.  The report described Boyell's "operating principles," or the facts or data considered in forming his opinion on the phone's propensity to cause thermal burns:

> A mobile phone of this type continually "checks in" with its host network (Sprint, Verizon, ATT, etc.) and provides its host network with its approximate location in the world.  Its location is implied by the cellsite (base station) with which the last connection was made. . . .  [T]he phone continually scans its nearby cellsites and, when the cellsite is observed to change, the phone "registers" its location by transmitting a data burst to the network. . . .  Continual location changes therefore

require continual checking in.  A trip along major highways at an average speed of 50 mph will pass typically 20 cellsites per hour.  Every new site encountered will cause the phone to transmit a data burst, requiring its transmitter to turn on and draw power from the battery.  This is why a phone in motion, even if not used to make or receive calls, depletes its battery much faster than the same phone sitting in an office – typically measured in hours rather than in days.  When the transmitter turns on and draws power from the battery, some of that power is dissipated by the electronics in the form of heat.  It is common to feel a phone getting hot in one's hand during a prolonged voice call.  In the matter at issue, the [cell] phone would heat as a result of repeatedly checking in.

Boyell Report at 2.

Using these principles, Boyell conducted a "replication" by placing a two-way, 15-minute phone call from Plaintiff's cell phone and found that the temperature of the surface of the phone increased 18 degrees Celsius in open air.  *Id.* at 3.  Based on an 18-degree Celsius temperature increase, Boyell then "extrapolated" that if the phone were "confined under light clothing against human skin" (which has a normal temperature of 36 degrees Celsius) as it was during Plaintiff's bus ride, a "temperature rise of 18 C will bring the face of the phone to 54 C. . . .  In actuality the temperature will not get to 36 + 18 = 54 C because of some amount of heat dissipation through the skin. . . .  However, if only half the temperature rise due to the phone is transferred to the skin through direct contact, the skin temperature will be 36 + 9 = 45 C."[3]  *Id.* at 3.  Relying on scientific studies that show the threshold temperature for an exposure burn is 44 degrees Celsius, Boyell concluded that the cell phone would be sufficiently hot to cause damage to the epidermis after prolonged exposure.  *Id.* at 3-4.  Boyell then summarized his expert opinion based on the facts of this case:

> I conclude that, to a reasonable engineering certainty, the [cell phone] caused skin burns to your client's body.  Because of the design of the instrument, the phone overheated during a trip even though she was not operating it to make or receive calls.  Simply holding it against her body resulted in the burns.  The instrument caused burn damage before its effect was perceived by your client.

---

[3]      54 degrees Celsius is 129.2 degrees Fahrenheit; 45 degrees Celsius is 113 degrees Fahrenheit.

*Id.* at 5.

Boyell's "extrapolation" assumed that the initial temperature of Plaintiff's cell phone was 36 degrees Celsius (*i.e.*, body temperature), that it would generate energy equivalent to an increase of 18 degrees Celsius during the bus ride when it was in "sleep mode," that 50% of the cell phone's temperature rise would transfer to the Plaintiff's skin and the balance would dissipate, and that, as a result, the cell phone would have a surface temperature of 45 degrees Celsius – hot enough to cause Plaintiff's injury.

There is simply "too great an analytical gap" (several, actually) for his extrapolation to be reliable evidence. First, unlike Boyell's "replication" using a two-way phone call, Plaintiff's phone was in sleep mode when her injury occurred. This alone raises relevance concerns and raises concerns whether Boyell "applied [his] principles and methods reliably to the facts of the case." *See* Fed. R. Evid. 702. Second, Boyell offers no support for his assumptions that (1) at the beginning of the bus ride (and the beginning point of the phone's thermal temperature rise) the surface of the cell phone would be equal to the temperature of Plaintiff's body[4]; (2) the cell phone would generate the same amount of thermal energy when it was in sleep mode but periodically reregistering with passing cell towers as it did during a 15-minute active phone call; and (3) the amount of heat that would dissipate rather than be absorbed was 50% of the total temperature rise (as opposed to 10% or 90% or anything in between). Notwithstanding Boyell's qualifications as an engineering expert, his own *ipse dixit* is insufficient to tie his replication and extrapolation to the facts of this case; he is therefore precluded from offering these opinions at trial. *Cf. Kumho Tire*, 526 U.S. at 153-54 (affirming the trial court's exclusion of a qualified

---

[4]     Depending on the thermal conductivity of the materials in the cell phone, through pure conductivity – regardless of its temperature at the outset – Plaintiff's body heat would have warmed the cell phone to something approaching 98.6 degrees Fahrenheit (or 36 degrees Celsius) eventually.

expert's testimony which was based on an accepted methodology because it was unreasonable to use that methodology "to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*." (emphasis in original)).

Defendants next argue that Boyell should be precluded from offering any opinions about RF radiation under Fed. R. Civ. P. 37(c) because Boyell's report did not describe his opinions on the subject of RF radiation.  Sprint Mem. Law at 12-13; HTC Mem. Law at 17.  When an expert witness is retained for the purpose of providing expert testimony in a case, the party proffering the expert testimony must produce a Rule 26 disclosure identifying the expert witness and include with it a written report prepared and signed by the witness containing:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).[5]  "If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or was harmless."  Fed. R. Civ. P. 37(c)(1). The purpose of the Rule 37(c) exclusion is "to prevent the practice of 'sandbagging' an opposing

---

[5]      A party also has a duty to supplement an expert witness disclosure "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1).

party with new evidence," especially when new evidence is submitted for the purpose of precluding summary judgment. *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 606-07 (S.D.N.Y. 2004) (citations omitted).  Courts in the Second Circuit, however, "recognize that preclusion of [expert] evidence pursuant to Rule 37(c)(1) is a drastic remedy and should be exercised with discretion and caution." *Id.* at 607 (citations omitted).  In determining whether to exclude expert testimony, courts consider "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) (quoting *Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006) (alterations omitted)).

Mr. Boyell's report did not disclose his opinion that RF radiation was a possible cause of Plaintiff's injury.  The report was self-limiting to the subject of *thermal* burns caused by a normally operating cell phone.  Boyell Report at 1.  Nowhere did Boyell state an opinion that the cell phone caused Plaintiff's injury due to its emission of RF radiation, which Sprint claims he disclosed for the first time at his deposition.  Sprint Mem. Law at 12.  Even assuming, as Plaintiff argues, that Defendants were on notice that RF radiation was a theory of causation alleged in the Complaint, Pl. Mem. Law Opp. at 22, and accepting that RF radiation as a potential cause of Plaintiff's injury was at least mentioned during Boyell's deposition, *see* Haworth Decl. Exh. J at 82-85, Plaintiff has not supplemented Boyell's initial report to substantiate Boyell's opinion that the RF radiation emitted by Plaintiff's cellular phone was a possible cause of her injury as Rule 26(e) requires.  *See also* Fed. R. Civ. P. 26(e)(2) ("[T]he party's duty to supplement extends . . . to information given during the expert's deposition.").

Thus, Defendants do not have the benefit of the information Rule 26(a)(2)(B) requires: a *complete* statement of Boyell's opinion on RF radiation as a possible cause of Plaintiff's injury and the basis and reasons for that opinion, as well as the facts or data on which Boyell relied in forming his opinion.

Plaintiff argues that Boyell's testimony on Plaintiff's RF radiation exposure during the bus trip should be admissible because it is a "known physical fact of the way cell phones work." Pl. Mem. Law Opp. at 22.  To the extent that is true, Boyell's expert opinion would be relevant if it tends to make it more likely that Plaintiff was exposed to sufficient RF radiation to *cause her injury*.  Assuming that is his opinion (*i.e.*, a normally operating cell phone emits sufficient RF radiation to cause harm to a human if the phone is next to human skin for 9 hours while the phone regularly re-registers with passing cellular towers), Defendants are entitled to an opportunity to test the reliability of that opinion before it is admitted against them at trial. Plaintiff's failure to make full Rule 26 disclosures deprived Defendants of that opportunity. Plaintiff has offered no explanation for the failure to comply with the disclosure requirement or duty to supplement her disclosures before this late juncture, and the failure was neither substantially justified nor harmless.[6]  Defendants would likely require new expert testimony of their own to meet the new evidence causing further expense and delay, as well as a second deposition of Mr. Boyell.  Mr. Boyell is therefore precluded from proffering an opinion that RF radiation emitted from Plaintiff's cellular phone caused her injury.

Boyell's Rule 26 disclosure did state his opinion on *how* a cell phone operates by "checking in" with cellular towers as it travels.  This information is potentially relevant because

---

[6]      Plaintiff was given an opportunity to demonstrate to the Court whether any evidence in the record could explain the amount of radiation that was emitted. Dkt. 107.  Plaintiff was unable to make such a demonstration and did not at that time seek leave to supplement Boyell's Rule 26 disclosure, even though she was on notice that this was clearly an issue.  *See* Dkt. 108.

14

it might help the trier of fact understand a fact at issue in the dispute.  Subject to a more complete understanding of how the Plaintiff intends to prove her case at trial, Boyell will be permitted to testify as to the operation of cell phones generally, but he will not be permitted to express an opinion that Plaintiff's injury could have been or was caused by either thermal or RF radiation generated from her cell phone's normal operation during the bus ride.

### 2. *Dr. Kiril Kiprovski*

HTC challenges Dr. Kiril Kiprovski's qualification to testify on the issue of general causation; that is, whether Plaintiff's cell phone was capable of causing Plaintiff's injury with its RF radiation emissions.  HTC Mem. Law at 18.  HTC disputes: (1) whether Dr. Kiprovski is qualified to offer expert testimony on RF radiation; (2) whether he could reliably conclude that Plaintiff's neuropathic injuries were caused by the cell phone based on her statements to that effect and the notes from her primary care physician that were, for the most part, illegible; and (3) whether testimony that RF radiation caused Plaintiff's injury is beyond the scope of Dr. Kiprovski's expert disclosure under Rule 26(a)(2)(C).  HTC Mem. Law at 18; HTC Reply Mem. Law at 5-6.

The Court finds Dr. Kiprovski is qualified to provide expert medical testimony.  He has been practicing medicine for 25 years; he is licensed to practice in New York and is board certified in neurology and clinical neurology.  Kiprovski Decl. ¶ 1 (Dkt. 65).  His areas of medical practice include general neurology, neuromuscular problems and disorders, and nerve diseases.  *Id.*  He is an Associate Professor of Neurology at the Department of Neurology of the Clinical Neurophysiology Division of New York University's Langone Hospital for Joint Diseases and a member of the faculty of the Department of Neurology at New York University Medical School.  *Id.*  He clears Rule 702's hurdle.  *See McCullock v. H.B. Fuller Co.*, 61 F.3d

1038, 1043 (2d Cir. 1995) (finding a board-certified medical doctor was qualified to provide

expert testimony on a throat ailment and its causes based on thirty years of practice as an ear,

nose, and throat specialist).

Dr. Kiprovski's expert qualification extends to causes of neuropathic injuries so long as

his conclusions are based on reliable methodologies and are reliably applied to the facts.  HTC's

argument that he must be an expert in RF radiation to testify that Plaintiff's cell phone caused

her injury fails.  *See* Fed. R. Evid. 703, 705; *Romanelli v. Long Island R.R. Co.*, 898 F. Supp. 2d

626, 631 (S.D.N.Y. 2012).  In *McCullock*, the Second Circuit rejected a similar argument.  61

F.3d at 1043.  In that case, the Second Circuit held that the physician – an ear, nose, and throat

doctor with almost thirty years of experience – was qualified to testify to his diagnosis that fumes

from the defendant's glue caused his patient's throat polyps.  *Id.*  The court so held even though

there was not "a single piece of medical literature" to support his diagnosis, because the

diagnosis was based on a "range of factors," including, *inter alia*, "his care and treatment of [the

plaintiff]; her medical history (as she related it to him and as derived from a review of her

medical and surgical reports)"; the doctor's "training and experience"; and the use of a

differential diagnosis.  *Id.* at 1044.  The court noted that requiring causation testimony from an

expert on environmental medicine specifically would be "an unwarranted expansion of the

gatekeeper role announced in *Daubert*."  *Id.*  The court noted that any "[d]isputes as to the

strength of his credentials, faults in his use of [his diagnostic] methodology, or lack of textual

authority for his opinion, go to the weight, not the admissibility, of his [opinion]."  *Id*.

Just like the treating physician in *McCullock*, Dr. Kiprovski is qualified to testify to his

opinion that Plaintiff's cell phone was the cause of the burn based on his treatment of Plaintiff, a

review of her medical history, his own training and experience treating nerve damage, and a

16

differential diagnosis that weighs all of those factors and rules out other possible causes.  *See*

Kiprovski Decl. ¶¶ 25-29.  Dr. Kiprovski first treated Plaintiff on June 27, 2012.  Kiprovski

Report, Cerussi Decl. Exh. DD; Kiprovski Decl. Exh. 1 (Dkt. 65-1).  Dr. Kiprovski's Initial

Consultation Report recounted the onset of Plaintiff's alleged burn, recited her treatment by other

physicians for the alleged burn, and generally summarized her medical history.  Kiprovski

Report at 1-3.  It documented her self-described symptoms and the results of his physical

examination.  Dr. Kiprovski's records of subsequent visits with Plaintiff showed that Plaintiff's

symptoms persisted.  *See id.* (treatment records for August 31, 2012; December 7, 2012; and

June 19, 2013).

Dr. Kiprovski concluded that "[t]he diagnosis of complex regional pain syndrome

[CRPS] will explain the chronic pain and protracted healing.  There is a causal relationship of

[Plaintiff's] symptoms and the injury that occurred due to second-degree skin burn from the cell

phone over the left breast."  Kiprovski Report at 5.  Dr. Kiprovski's Initial Consultation Report

also stated:

> It is universally accepted that radiofrequency radiation can cause tissue heating
> due to thermal effects.  The mechanism of [Plaintiff's] injury is probably due to
> non-ionizing radiofrequency radiation from the cell phone and the subsequent
> thermal skin injury leading to second degree burn which includes injury to the
> intraepidermal and dermal nerves, sensory receptors and cutaneous nerve
> terminals.

Cerussi Decl. Exh. DD, Kiprovski Initial Consultation, June 27, 2012, at 4.

Plaintiff's expert disclosure of Dr. Kiprovski as a treating physician under Rule

26(a)(2)(C) and Dr. Kiprovski's opinion that Plaintiff's burn was caused by her cell phone meet

the requirements *Daubert* and the Federal Rules of Evidence.[7]  The disclosure and his opinion

---

[7]      Plaintiff disclosed that the subject of Dr. Kiprovski's testimony would be his "[c]are and treatment of
plaintiff Maria Roman for reflex sympathetic dystrophy (RSD)/ Complex Regional Pain Syndrome I (CRPS)
proximately caused by exposure to the powered-on cell phone . . . during October 2-3, 2010" and his opinion that

that RF radiation emissions from the cell phone caused her burn, however, do not.  Accepting

Plaintiff's description of the events surrounding the appearance of the burn as true, a treating

physician could conclude that the onset of a cell phone-shaped burn – a burn being a commonly-

treated injury that is caused by a foreign object – was caused by the cell phone.  But there is a

link missing between Dr. Kiprovski's conclusion that the cell phone caused Plaintiff's burn

based on readily apparent physical evidence and his opinion that it was the phone's *RF radiation*

specifically that caused the burn or resulting neurologic condition.  As explained below, his

opinion would at the very least require a more robust disclosure under Rule 26(a)(2)(B) to

substantiate its reliability, rather than the Rule 26(a)(2)(C) disclosure Plaintiff provided.  Dr.

Kiprovski is therefore precluded from offering his opinion that the cell phone's RF radiation

caused Plaintiff's burns.

       A treating physician's testimony is based on the physician's personal knowledge acquired

from the examination, diagnosis, and treatment of the patient.  *Puglisi v. Town of Hempstead*

*Sanitary Dist. No. 2*, 92 F.R.D. 113, at *3 (E.D.N.Y. 2013).  The Federal Rules, therefore, permit

different disclosures from treating physicians than are required from medical experts whose

knowledge was acquired or opinion developed in anticipation of trial.  *See id.*  Unlike the

detailed report required by Rule 26(a)(2)(B), Rule 26(a)(2)(C) requires only disclosure of "the

subject matter on which the witness is expected to present evidence under Federal Rule of

Evidence 702, 703, or 705" and "a summary of facts and opinions to which the witness is

expected to testify."  Fed. R. Civ. P. 26(a)(2)(C); *Romanelli*, 898 F. Supp. 2d at 630-31.  "In the

absence of an expert [Rule 26(a)(2)(B)] report . . . the testimony of [plaintiff's] treating

---

"Ms. Roman's RSD/CRPS I . . . was substantially caused by exposure of her left breast to the powered-on cell phone
on October 2-3, 2010."  Cerussi Decl. Exh. DD.  She also disclosed Dr. Kiprovski's opinion that the cell phone's RF
radiation emissions specifically caused Plaintiff's injury.  *Id.*

physicians will be limited to opinions they actually formed during the course of treating [the

plaintiff]." *Romanelli*, 898 F. Supp. 2d at 631 (quoting *Williams v. Regus Mgmt. Grp., LLC*, No.

10-CV-8987 (JMF), 2012 WL 1711378, at *3 (S.D.N.Y. May 11, 2012)). "Courts in the Second

Circuit have regularly held this includes opinions on causation." *Id*. (citing *Regus Mgmt. Grp.*,

2012 WL 1711378, at *3). "Even treating physicians, however, must demonstrate a

scientifically reliable method to support their conclusions." *Id.* (internal quotations and citation

omitted). "Notwithstanding the general rule that treating physicians may testify as to injury

causation, the Court is charged with a gatekeeping function to ensure that invalid and unreliable

expert testimony is not presented to a jury." *Green v. McAllister Bros., Inc.*, No. 02-CV-7588

(FM), 2005 WL 742624 at *14 (S.D.N.Y. Mar. 25, 2005).

Dr. Kiprovski reached his conclusion that the cell phone caused Plaintiff's burn through a

differential diagnosis. "A differential diagnosis is a patient-specific process of elimination that

medical practitioners use to identify the most likely cause of a set of signs and symptoms from a

list of possible causes." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 254 (2d Cir. 2005)

(internal quotations and citation omitted). "Where an expert employs differential diagnosis to

'rule out' other potential causes for the injury at issue he must also 'rule in' the specific cause,

and do so using scientifically valid methodology." *Id*. (internal quotations and citations omitted).

A differential diagnosis may provide a reliable foundation for an expert's opinion on general

causation – that is, that "the final, suspected 'cause' remaining after this process of elimination

[is actually] *capable* of causing the injury" – in the absence of bolstering scientific studies or

published reports in case-specific circumstances due to "the rigor of differential diagnosis

performed, the expert's training and experience, [or] the type of illness or injury at issue." *Id*.

*See also Perkins v. Origin Medsystems, Inc.*, 299 F. Supp. 2d 45, 56 (D. Conn. 2004) (collecting

cases where a court admitted a physician's testimony on general causation formed by differential diagnosis, despite a lack of epidemiological studies to support the opinions). And, "in appropriate circumstances, a temporal relationship between two events can serve as one aspect of a more thorough differential diagnosis." *DeRienzo v. Metro. Trans. Auth.*, 694 F. Supp. 2d 229, 240 (S.D.N.Y. 2010). "A district court 'has broad discretion in determining whether in a given case a differential diagnosis is enough by itself' to prove causation." *Id.* at 237 (quoting *Ruggiero*, 424 F.3d at 254). Alternatively, "[w]hen the causal connection is obvious to the average man, 'such as a broken leg from being struck by an automobile,' the causal inference can be left to the fact finder and expert testimony [on general causation] is not required." *Romanelli*, 898 F. Supp. 2d at 631; *see also Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 88 (2d Cir. 2006) (no expert testimony on causation in a negligence action under the Federal Employers' Liability Act, 45 U.S.C. § 51 was required when "there [was] a generally understood causal connection between the physical phenomena . . . and the alleged injury that would be obvious to the layman" (quotations omitted)). If a causal inference may be drawn by the fact finder, it follows, *a fortiori*, that the treating physician's expert differential diagnosis on general causation would not suffer from a lack of reliability.

Absent from Dr. Kiprovski's treatment notes and Plaintiff's Rule 26 disclosure is any indication as to what methodology Dr. Kiprovski relied on in concluding that the "mechanism of [Plaintiff's] injury [was] probably due to non-ionizing radiofrequency radiation from the cell phone." Kiprovski Report at 4. Neither Plaintiff nor Dr. Kiprovski has pointed to *any* scientific literature that would substantiate Dr. Kiprovski's opinion that cell phones emit sufficient RF radiation to cause damage to human nerves. The Court accepts as true Dr. Kiprovski's statement that "[i]t is universally accepted that radiofrequency radiation can cause tissue heating due to

thermal effects." *Id.* But it is not universally accepted that a *cell phone* emits *sufficient* RF radiation to cause a second-degree burn to human tissue.

This is not an injury akin to suffering a broken leg after being struck by an automobile.[8] It therefore requires expert testimony to bridge the analytical gap, which must be supported by a Rule 26(a)(2)(B) expert disclosure. *Daubert* scrutiny is necessary to verify that, despite a lack of general acceptance, the opinion is otherwise based on reliable methodology that is applied reliably to the facts of the case. Because there was nothing beyond an *ipse dixit* to support Dr. Kiprovski's conclusion that Plaintiff's injury was caused by RF radiation, he will not be allowed to testify to that opinion. On the other hand, his testimony that Plaintiff's burn was caused by her cell phone is one that he formed as her treating physician; because a trier of fact could reasonably reach this same conclusion without expert testimony, it is admissible opinion testimony, even in the absence of the more robust expert disclosure.

In sum, Dr. Kiprovski will be allowed to testify to a causal relationship between the cell phone's placement, Plaintiff's burn, and the resulting CRPS, but he will not be allowed to testify that it was RF radiation that caused Plaintiff's injury.

### b. Defendants' Motions for Summary Judgment

Summary judgment is appropriate when the record demonstrates that there is "no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that it is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004). The motion should be granted "if the pleadings, depositions, answers

---

[8]     It is presumably within Dr. Kiprovski's expertise to testify that a certain level of RF radiation can cause damage to human tissue, but there is no evidence in the record what that level is, nor is there any evidence that a normally operating cell phone emits that level of RF radiation.

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to [the absence or presence of] any material fact." *Id.*; Fed. R. Civ. P. 56(c).

"[N]ot only must there be no genuine issue as to the evidentiary facts, but there must also be no

controversy regarding the inferences to be drawn from them." *Harris v. Provident Life &*

*Accident Ins. Co.*, 310 F.3d 73, 78 (2d Cir. 2002) (quoting *Donahue v. Windsor Locks Bd. of Fire*

*Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987)).   The Court "is not to weigh the evidence but is

instead required to view the evidence in the light most favorable to the party opposing summary

judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility

assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004).  Any

ambiguity is to be resolved in favor of the nonmoving party.  *Harris*, 310 F.3d at 78.  To avoid

summary judgment, the opposing party "must come forward with specific facts showing that

there is a *genuine issue for trial*."  *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002).

Only when "the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party [is there] no genuine issue for trial."  *Huminski*, 396 F.3d at 70 (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (alteration in

original)).

     **c.  *Failure to Warn***

     Under New York law, which governs this diversity action, a failure to warn plaintiff must

show: (1) the defendant had a duty to warn; (2) against dangers resulting from foreseeable uses

about which it knew or should have known; and (3) the failure to do so was the proximate cause

of the harm.  *In re Fosamax Prods. Liab. Litig.*, 924 F. Supp. 2d 477, 486 (S.D.N.Y. 2013); *see*

*also Santoro v. Donnelly*, 340 F. Supp. 2d 464, 485 (S.D.N.Y. 2004).[9]  New York's "heeding

---

[9]     Failure to warn liability extends to "sellers in the normal course of business."  *Gebo v. Black Clawson Co.*,
703 N.E.2d 1234, 1238 (N.Y. 1998).

presumption" dictates that "the Court must presume that a user would have heeded warnings if they had been provided, and that the injury would not have occurred." *In re Fosamax*, 924 F. Supp. 2d at 486.  Put differently, if a warning is missing or found to be inadequate, proximate cause is presumed.  No defect in the product itself need be proven; "[i]t has long been established in New York that the duty to warn of dangers in the use of the product exists even though the product is perfectly designed and made." *Anderson v. Hedstrom Corp.*, 76 F. Supp. 2d 422, 440 (S.D.N.Y. 1999) (citing *Fane v. Zimmer, Inc.*, 927 F.2d 124, 128 (2d Cir. 1991)).  As with most actions sounding in negligence, "[f]ailure-to-warn liability is intensely fact-specific, including but not limited to such issues as feasibility and difficulty of issuing warnings in the circumstances; obviousness of the risk from actual use of the product; knowledge of the particular product user; and proximate cause." *Liriano v. Hobart Corp.*, 700 N.E.2d 303, 309 (N.Y. 1998).

A manufacturer or seller in the normal course of business has a duty to warn "(1) against latent dangers resulting from foreseeable uses of its product of which it knew or should have known, and (2) of the danger of unintended uses of a product provided these uses are reasonably foreseeable." *Bee v. Novartis Pharma. Corp.*, --- F. Supp. 2d ---, No. 12-CV-1421 (JFB), 2014 WL 1855632 at *10 (E.D.N.Y. May 9, 2014) (quoting *Liriano*, 677 N.Y.S.2d at 766).  "This duty is a continuous one, and requires that a manufacturer be aware of the current information concerning the safety of its product." *Id.*  To establish a duty to warn under either theory, a plaintiff must first establish a causal link between the injury and the product, which requires both general causation and specific causation.  "General causation 'bears on whether *the type of injury at issue can be caused or exacerbated* by the defendant's product.  'Specific' causation bears on whether, in the particular instance, the injury *actually was caused or exacerbated* by the

23

defendant's product." *In re Rezulin Prods. Liab. Litig.*, 441 F. Supp. 2d 567, 575 (S.D.N.Y. 2006) (quoting *Ruggiero*, 424 F.3d at 252 n.1).

Whether a plaintiff may meet the burden of proving causation without expert testimony depends on whether "the nexus between the injury and the alleged cause" would be "obvious to the lay juror." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2002). If expert testimony is not required, a plaintiff may make a *prima facie* case through circumstantial evidence if she "shows facts and conditions" from which causation of the injury "may be reasonably inferred." *Williams v. KFC Nat'l Mgmt. Co.*, 391 F.3d 411, 421 (2d Cir. 2004); *accord Fane*, 927 F.2d at 131 (requirements for a prima facie showing of causation for a bone fracture which, "[i]n many instances . . . is a matter within the experience and observation of the ordinary juryman," are different if the alleged cause of the fracture is a medical device implanted as part of a "complicated surgery"; the latter was "beyond the sphere of the ordinary juryman and required expert testimony."). "New York has long recognized the viability of [a] circumstantial approach in products liability cases." *Speller ex rel. Miller v. Sears, Roebuck & Co.*, 790 N.E.2d 252, 254 (N.Y. 2003).

To withstand a motion for summary judgment, a plaintiff must also introduce evidence that the latent danger from the use or misuse of the product was foreseeable. *Novartis*, 2014 WL 1855632 at *11 ("Typically, summary judgment is appropriate where a plaintiff has not introduced any evidence that a manufacturer knew or should have known of the danger at issue.").

If a defendant had a duty to warn, the focus shifts to whether the defendant adequately discharged that duty. "Liability for failure to warn may be imposed based upon either the complete failure to warn of a particular hazard or the inclusion of warnings that are insufficient."

*Fisher v. Multiquip, Inc.*, 949 N.Y.S.2d 214, 218 (N.Y. App. Div. 2012).  "An adequate warning or instruction is one that is understandable in content and conveys a fair indication of the nature and extent of the danger to a reasonably prudent person."  *Cooley v. Carter-Wallace, Inc.*, 478 N.Y.S.2d 375, 378 (1984).  "The sufficiency of a warning is dependent upon both the language used and the impression that the language is calculated to make upon the mind of the average user of the product."  *Id.*  "Of critical importance is whether the warning sufficiently conveys the risk of danger associated with the product and is qualitatively sufficient to impart the particular risk of harm."  *Id.*

Given the fact-intensive nature of the inquiry, "[t]he adequacy of the instruction or warning is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment."  *Urena v. Biro Mfg. Co.*, 114 F.3d 359, 366 (2d Cir. 1997) (quoting *Beyrle v. Finneron*, 606 N.Y.S.2d 465, 466 (N.Y. App. Div. 1993)).  A "jury does not need expert testimony to find a warning inadequate, but may use its own judgment considering all the circumstances."  *Billar v. Minn. Mining & Mfg. Co.*, 623 F.2d 240, 247 (2d Cir. 1980).  If defendants produce expert evidence suggesting a warning was sufficient or additional warnings would have been ineffective under the circumstances, a jury is free to accept or disregard that testimony in favor of their own judgment.  *Adebiyi v. Yankee Fiber Control, Inc.*, 705 F. Supp. 2d 287, 290-91 (S.D.N.Y. 2010).

**d.  Analysis**

Defendants argue that there is no genuine issue of fact whether they owed a duty to warn because (1) Plaintiff lacks an expert witness on warnings to testify as to the adequacy of the warnings provided; and (2) Plaintiff lacks evidence to establish a causal link between the cell phone and Plaintiff's injury.  As to Defendants' first argument, it is well-settled under New York

law that the adequacy of a warning is a question for the jury that does not require expert

testimony.  *See Billar*, 623 F.2d at 247 (rejecting as "meritless" the argument that an expert

opinion was required to prove a warning was inadequate under New York law).[10]  Indeed, the

adequacy of a warning is particularly well suited for the ken of an ordinary juror because liability

for failure to warn turns on whether the danger was communicated to the user of the product.  *Id.*

at 247.  Thus, whether summary judgment based on this element of Plaintiff's claim is

appropriate depends on whether Plaintiff has offered adequate evidence to establish a *prima facie*

case of causation based on her testimony as to the events surrounding her injury; Boyell's

testimony on cell phone operation; and Dr. Kiprovski's medical testimony that Plaintiff's burn

was caused by the cell phone.  The Court finds that she has.

Viewed in the light most favorable to the nonmoving party, the evidence shows that

Plaintiff placed the phone against her bare skin while it was still "on" and left it there while she

slept during a nine-hour trip.  HTC 56.1 ¶ 25.  After arriving in New York, she removed the

phone and noticed that it had been stuck to her skin.  Pl. Mem. Law Opp. at 3.  Over the next

several hours, a painful, visible burn developed in the area that had been in contact with the

phone.  Roman Aff. ¶ 8, Ex. 3.  Plaintiff sought medical treatment and was diagnosed with a

second-degree burn within days of the incident.  Roman Aff. ¶ 7.  Dr. Kiprovski testified that if

Plaintiff suffered a second degree burn in that area of her body, it could damage the underlying

nerves and cause CRPS.  Causation in Plaintiff's case is more like a broken leg caused by an

automobile accident, which is "a matter within the experience and observation of the ordinary

jur[or]," than a toxic tort, which would require expert medical testimony to establish that the

---

[10]     The cases the Defendants rely on for the proposition that a products liability plaintiff must produce expert testimony as part of her *prima facie* case relate to causes of action for design defect and breach of warranty.  These cases are inapposite to a claimed failure to warn.

substance is capable of causing the particular ailment from which a Plaintiff suffered.  *Fane*, 927 F.2d at 131.

Based on Plaintiff's testimony alone, a jury could "reasonably infer" a causal link between the cell phone and the burn.  *Williams*, 391 F.3d at 421; *see also Voss v. Black & Decker Mfg. Co.*, 450 N.E.2d 204, 209 (N.Y. 1983) ( expert testimony is not required in a strict liability claim if a juror could find proximate causation from the characteristics of the product and plaintiff's description of the accident).

Moreover, none of the Defendants offers an alternative explanation for the burn that appeared on Plaintiff's skin.  "[W]here an injury has multiple potential etiologies, expert testimony is necessary to establish causation," but "[i]t is well settled that expert testimony is unnecessary in cases where jurors 'are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training.'"  *Wills*, 379 F.3d at 46 (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962)).  In short, Plaintiff has produced enough evidence to create a genuine issue of material fact whether the cell phone caused her injury.

A defendant may avoid liability by negating the presumption that the inadequate warning proximately caused the injury by pointing to specific facts which show existing warnings were adequate as a matter of law or that additional warnings would have been futile.  *Santoro*, 340 F. Supp. 2d at 486.  HTC argues that if Plaintiff cannot prove causation, then it would not be liable for failure to warn against a non-danger as a matter of law.  That is, of course, true, but there is sufficient evidence in the record to create a question of fact as to causation.  Alternatively, HTC points to a number of warnings that were provided, but none addresses the specific use at issue here: storing a powered on cell phone next to the skin for an extended period of time while the

27

cell phone is in motion.  Thus, whether the warnings were adequate is a question of fact for the jury.  Because proximate cause is presumed under New York's heeding assumption, there is a genuine issue of fact whether inadequate warnings proximately caused Plaintiff's injury.

### III.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss Plaintiff's failure to warn claim pursuant to Federal Rule of Civil Procedure 56 are DENIED.  Plaintiff's motions *in limine* to exclude Defendants' expert witnesses will be dealt with in a separate opinion.

The Clerk of Court is directed to terminate Docket Entry 39 and 48.


**SO ORDERED.**

**Date:  September 29, 2014**
            **New York, NY**

**VALERIE CAPRONI**
**United States District Judge**